**Caryl WOLF, Plaintiff,**

v.

**PLANNED PROPERTY MANAGEMENT, Defendant.**

**No. 89 C 1331.**

United States District Court, N.D. Illinois, E.D.

April 26, 1990.

James R. Fennerty, Alexander, Fennerty & Fujimoto, Chicago, Ill., for plaintiff.

William H. Hrabak Jr., Feiwell, Galper & Lasky Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Caryl Wolf has petitioned this court for costs pursuant to Rule 54(d), Fed.R.Civ. Pro., and attorneys fees pursuant to 42 U.S.C. § 1988 (1982). Wolf makes these requests since she prevailed on some aspects of her dispute with Planned Property Management. See *Wolf v. Planned Property Management*, 1990 WL 19918, 1990 U.S.Dist. LEXIS 1947 (N.D.Ill. Feb. 23, 1990). The court will address her bill of costs first.

*Bill of Costs*

■ Wolf requests $5,601.28 in costs. Planned Property objects to a few of the items for which Wolf seeks reimbursement. Wolf first seeks $378.00 for daily transcripts of the trial testimony of two adverse witnesses, Scott Meyers and Robert Burford. As this court noted in *Easter House v. State of Ill. Dept. of Children*, 663 F.Supp. 456, 461 (N.D.Ill.1987), "[r]eimbursement for daily copy is discretionary, and whether the court should allow it depends on such factors as the length and complexity of the trial, and the need for transcripts to resolve disputes about testimony or to prepare proposed findings of fact." Like the trial in *Easter House*, the trial in this case was not a difficult one. The issues were not complex, and an attorney could have gleaned the important points from Meyers and Burford's testimony by taking careful notes. Daily copy was a convenience in this case, not a necessity. The court will deny Wolf's request for these costs.

■ Planned Property's second objection is to $143.50 in payments made 11/12/86 and 7/6/88 to a reporting service for deposition transcripts. Under 28 U.S.C. § 1920(2) (1982), the court may tax as costs "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in a case." Wolf does not name the deponents who were covered in the two bills mentioned above. For all that the court knows, Wolf deposed her best friend about the Chicago Cubs' chances of winning the World Series—an important topic, assuredly, but one not vital to the outcome of Wolf's dispute with Planned Property. The court will reject Wolf's claims for these services.

■ Planned Property next objects to $14.98 in long-distance telephone charges. Section 1920 does not list long-distance telephone charges as costs which the court may tax. The legal presumption is that if Congress did not list the item in § 1920, the court may not tax it. See *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 440–42, 107 S.Ct. 2494, 2496–97, 96 L.Ed.2d 385 (1987); *Wahl v. Carrier Manufacturing Co., Inc.*, 511 F.2d 209, 216–17 (7th Cir.1975). Wolf offers no arguments why the court should give special treatment to her request for long-distance charges, and

so the court will not impose those charges on Planned Property.[*]

■ Planned Property's last objection is to two plane tickets for one of Wolf's witnesses, Peter Soteropoulos. "Objection" is perhaps the wrong word; Planned Property expresses disgust at Wolf's request, without saying why the request is improper. Section 1920(3) allows the court to tax the fees and disbursements for witnesses; section 1821(c)(1) states that "[a] witness who travels by common carrier shall be paid for the actual expenses of travel on the basis of the means of transportation reasonably utilized and the distance necessarily traveled to and from such witness's residence...." Planned Property has not suggested why the court should not allow Mr. Soteropoulos's plane tickets, and they appear to be reasonable expenses. The court will allow them. All told, Wolf is entitled to $5,064.80 in taxable costs.

*Attorneys Fees*

■ The attorneys fee issues in this case are more difficult than the cost issues. Then again, more is at stake. The parties agree that the proper way for the court to approach the calculation of attorneys fees is outlined in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). *Hensley* directs the court to begin its calculation by taking "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. at 1939. Wolf and Planned Property disagree on both parts of the *Hensley* equation, namely, the reasonable number of hours expended on this case and a reasonable hourly rate for Wolf's attorneys.

The least complex part of this analysis for this dispute may be deciding what is a reasonable hourly rate for Wolf's attorneys. Wolf employed two attorneys, James Fennerty and Russell Green. Each suggests that a reasonable hourly rate for him is $180.00 per hour, and each has supported his suggestion with an affidavit explaining his background. Together they have submitted affidavits from Chicago attorneys who submit their thoughts about reasonable hourly rates for attorneys in the Chicago market.

One missing element is evidence that Fennerty and Green charge their paying customers $180.00 per hour. Green has admitted to the court that he bills his corporate clients between $150.00–175.00 per hour. This court noted in *Easter House* the importance of an attorney's actual rates in judging the reasonable rate for that attorney. See 663 F.Supp. at 459. Market rates are not a perfect estimate, of course. Markets have been known to fail, overvaluing the services of some lawyers while (in rare instances, in the court's experience) undervaluing the services of others. Still, losing parties should not have to pay premium hourly rates merely because their opponents prevailed under the civil rights laws. The court will thus treat Green and Fennerty's market rates as a starting point for their reasonable rate in this case.

Wolf suggests that Green and Fennerty deserve higher than their usual hourly rate in this case, for three reasons. She first argues that Green and Fennerty exposed themselves to a risk of not being paid. Wolf makes this same argument below in urging the court to multiply the *Hensley* "lodestar" to account for risk; the court thinks the discussion of the risk of no payment is better left until later. Her second argument is that Green and Fennerty had to wait to be paid, unlike their corporate clients who pay as they go. This argument is a perplexing one in light of Wolf's third argument, which is that this court's tight schedule for litigating this case forced Green and Fennerty to give up other opportunities. Wolf may not have it both ways. As a matter of fact, the delay in payment in this case has not been lengthy. Wolf first contacted Green and Fennerty in early 1989; the case ended in February 1990, and her attorneys will be paid today. The de-

---

[*] Wolf also has not argued that the court should award long-distance charges as part of a reasonable attorneys fee under 42 U.S.C. § 1988. See *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir.1984). If Wolf had, she would have had the burden of showing that it is the practice of Chicago-area attorneys to bill these costs to their clients. See discussion at p. 885 below.

lay is not so extraordinary as to require an adjustment for intervening inflation or lost interest on the fee award. As for Wolf's argument about lost opportunities, Green and Fennerty have not suggested that they missed out on uniquely lucrative projects to meet the court's calendar. They complain merely of something which inhibits not only lawyers, but most human beings: the inability to do two things at once.

Based on Green and Fennerty's performance in this case, the court's review of their resumes, the court's experience with going rates in the Chicago market, and the affidavits of other Chicago area attorneys, the court believes that $165.00 per hour is a reasonable hourly rate for attorneys of similar competence in the Chicago area. $165.00 is what the court will allow to Wolf's attorneys.

■ When Wolf hired Green and Fennerty, she retained the services of Green and Fennerty's support staff as well. In her petition for fees, Wolf seeks separate compensation for one member of that staff, Green and Fennerty's law clerk. In *Missouri v. Jenkins by Agyei*, —— U.S. ——, 109 S.Ct. 2463, 2470–71, 105 L.Ed.2d 229 (1989), the Supreme Court held that a reasonable attorneys fee under § 1988 can include compensation for the services of law clerks and paralegals. Such compensation is appropriate, however, only when "the prevailing practice in a given community" was that attorneys bill such time separately. The Court stressed again that the chief means of protecting losing parties from paying too much was the discipline of the market. See *id.* 109 S.Ct. at 2471 n. 9. This rein on compensable costs is similar to that proposed by Justice O'Connor in her concurring opinion in *Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 733, 107 S.Ct. 3078, 3090–91, 97 L.Ed.2d 585 (1987), for risk multipliers.

Given the importance of demonstrating how a given market compensates attorneys for certain costs, it is incumbent upon those who petition for fees to put forth some evidence of those practices. When it comes to Green and Fennerty's law clerk, Wolf has not carried her burden. Wolf has put forth no evidence that attorneys in the Chicago market bill their paying clients separately for the services of law clerks. As a result, this court will not charge those services to Planned Property. See *Leigh v. Engle*, 714 F.Supp. 1465, 1475–76 (N.D.Ill. 1989) (disallowing request for risk multiplier where petitioners submitted no evidence of market practices).

The court now turns to the thorniest issue raised by Wolf's petition, judging the reasonable number of hours spent by Wolf's attorneys in prosecuting her successful claims. Planned Property does not take issue with the amount of time which Wolf's attorneys spent on particular tasks—all told, 410.6 hours for Fennerty, and 148.1 hours for Green. The court has reviewed the hours claimed by Green and Fennerty for these tasks, and finds that they are reasonable.

Planned Property's only objection, and it is a critical one, is to compensating Wolf for hours which her attorneys spent on issues on which she did not prevail. As discussed in this court's February ruling, Wolf prevailed on her claims of retaliatory discharge in violation of 42 U.S.C. § 1981 and illegal housing discrimination under *id.* at § 3617. She voluntarily dismissed her claim under *id.*, § 1982, of illegal discrimination in the termination of her lease, and lost on her claim of illegal employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, *id.* at §§ 2000e et seq.

Planned Property rightly argues that § 1988 allows attorneys fees only to prevailing parties. Plaintiffs who prevail on some issues, but not others, should expect to collect on some issues, but not others. Separating the two is what is difficult. In attempting to do so, this court heeds the Seventh Circuit's instructions in *Jackson v. Illinois Prisoner Review Bd.*, 856 F.2d 890, 894 (7th Cir.1988) (citations omitted; additions in *Jackson*):

"A partially prevailing plaintiff should be compensated for the legal expenses he would have borne if his suit had been confined to the ground on which he prevailed plus related grounds within the

meaning of *Hensley*." Time spent on claims for relief that are unsuccessful and unrelated to the ultimate result achieved are not compensable. A claim is unrelated if it is "distinct in all respects," and "based on different facts and legal theories." Claims that "involve a common core of facts or [are] . . . based on related legal theories . . . [such that] counsel's time will be devoted generally to the litigation as a whole" are related and compensable even if not ultimately successful.

■ Wolf's attorneys list only 4.25 hours for work related solely to Wolf's § 1982 claim. To have prevailed on this claim, Wolf would have had to have proven three things which she proved in winning on her § 1981 and § 3617 claims: that Planned Property had a policy or practice of race discrimination, that she resisted this policy or practice, and that she suffered damage on account of her resistance. Her § 1982 claim differed from her winning claims only in that she would have had to have proven that (1) she was a tenant, (2) she lost an apartment on account of discrimination, and (3) loss of the apartment resulted in damages. It would have been relatively simple for Wolf to prove (1) and (3); as for (2), Wolf proved at trial that her apartment was part of her compensation for her job. Therefore, if Wolf had tried to prove that she lost her apartment on account of discrimination, she would have ended up putting forth the same proof which she proffered in support of her § 1981 claim: protesting discrimination cost her a job, and all of the benefits associated with that job.

From this analysis it is clear that Wolf's § 1982 claim was legally and factually related to the claims on which she prevailed. Accordingly, the court will not disallow Wolf's petition for fees for hours related to her § 1982 claim.

Wolf's request for fees for hours spent on her Title VII claim (15.75 hours for attorney Fennerty and 8.4 hours for attorney Green) does not fare as well as that for her § 1982 claim. On the one hand, the elements of a prima facie case of sex discrimination under Title VII do not overlap with the elements of a claim for race discrimination under §§ 1981 and 3617. The battle at trial, however, was not over whether Wolf could make out a prima facie case under Title VII, but whether Planned Property fired her on account of her gender. Planned Property's defense to this argument was that it had legitimate, nondiscriminatory reasons for firing Wolf. This defense was the same as the one which Planned Property presented against Wolf's §§ 1981 and 3617 claims. What resulted was a trial over Planned Property's attitudes towards race and gender, and Wolf's job performance.

In sum, Wolf could barely separate her Title VII claim from her other claims in developing her facts and researching the law in this case. As a result, the court will disallow only those hours which probably contributed little to Wolf's victory on her §§ 1981 and 3617 claims. This time includes 4.5 hours by attorney Fennerty in doing preliminary research on Title VII issues and in drafting Wolf's complaint; 3.0 hours by Fennerty in re-drafting proposed findings of fact near the end of trial; and 2.5 hours by attorney Green in performing the same task.

This leaves a reasonable claim of 403.1 hours for attorney Fennerty and 145.6 hours for attorney Green. At their reasonable rate of $165.00 per hour, this results in a "lodestar" figure of $90,535.50. There is one more factor which the court must consider before approving this amount, however. The Court in *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989), counseled the district courts to acknowledge a prevailing plaintiff's contractual arrangement with his or her attorney in deciding whether a lodestar was a reasonable fee for a case. The Court, however, stressed that a lodestar in excess of the contractual amount did not necessarily render the lodestar suspect. That is the case here. Wolf agreed to pay a fee to attorneys Fennerty and Green on a contingent basis. Accounting for Wolf's victory, that agreement would yield a $50,000.00 fee. That figure says little about whether the lodestar is a rea-

sonable amount for the work Wolf's lawyers performed, however. See *id.* 109 S.Ct. at 944–46.

 Wolf would like to do better than $90,535.50. She believes that her attorneys deserve a multiple of this amount, as she faced a high risk of not prevailing in this suit. This may be a ground for a multiplier, but the party who asserts it has a heavy burden to carry. The party must show how (1) other courts in the relevant market compensate for contingency, (2) the relevant market itself compensates for contingency, so as to attract competent counsel to similar cases, and (3) the risk of loss is not based on " 'legal' risks or risks peculiar to the case." *Leigh,* 714 F.Supp. at 1475–76, quoting *Delaware Valley,* 483 U.S. at 734, 107 S.Ct. at 3091 (O'Connor, concurring).

Wolf's argument fails on all three scores. She has put forth no data on how Chicago-area courts or the Chicago-area legal market compensates for contingency. She also has not indicated how her risk of loss was unrelated to the risks of her case. Since she bears the burden of persuasion on this issue, Wolf's failure to present this data is fatal to her claim for a multiplier. See *Leigh,* 714 F.Supp. at 1475–76.

*Conclusion*

The court taxes $5,064.80 in costs and awards Wolf $90,535.50 in attorneys fees.